IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JUNTAO CAI,                              )
                                         )
                    Plaintiff,           )        Civil No. 06-469-JO
                                         )
          v.                             )        OPINION AND ORDER
                                         )
DAIMLERCHRYSLER AG, a                    )
Federal Republic of Germany stock corporation, )
                                         )
                    Defendant.           )

          Jonathan S. Ostar
          Martin C. Dolan
          DOLAN GRIGGS  LLP
          1130 S.W. Morrison Street, Suite 630
          Portland, OR  97205

             Attorneys for Plaintiff

          Victor J. Kisch
          STOEL RIVES LLP
          900 S.W. Fifth Avenue, Suite 2600
          Portland, OR  97204

             Attorney for Defendant

JONES, Judge:

This action for breach of contract and breach of the covenant of good faith and fair dealing arises out of the employment relationship between plaintiff Juntao Cai and defendant DaimlerChrysler AG ("DCAG"), a Federal Republic of Germany stock corporation. Pursuant to Fed. R. Civ. P. 12(b)(2), DCAG specially appears in this action for the purpose of seeking dismissal for lack of personal jurisdiction (# 11). In the alternative, DCAG moves to dismiss the complaint based on forum non conveniens.

For the reasons explained below, I grant defendant's motion to dismiss for lack of personal jurisdiction; defendant's alternative motion is, therefore, moot.

## BACKGROUND ALLEGATIONS

This background summary is derived from the allegations in plaintiff's complaint. Plaintiff worked for Freightliner, a Portland, Oregon-based subsidiary of DCAG, beginning in 1995. In 1996, plaintiff executed a contract with Freightliner for an expatriate assignment in Shanghai, China. Plaintiff alleges that the parties intended the assignment to last three years, with a guaranteed return to an equivalent position in Portland, plaintiff's home base.

At the conclusion of his contract with Freightliner in 2000, Freightliner informed plaintiff that it had no equivalent position for him in Portland, but would attempt to find him a position with DCAG. Plaintiff continued to wind down business for Freightliner in Shanghai, and began negotiating a contract with DCAG, whose agents were in Germany and Shanghai. Plaintiff negotiated some terms of the contract while on a home visit in Portland in early 2001.

DCAG signed a contract with plaintiff on November 11, 2000, in Germany. Plaintiff signed the contract in China on August 14, 2001. At some point, DCAG sent the contract to Freightliner executives in Portland for review before submitting it to plaintiff. The contract

2 - OPINION AND ORDER

stated that plaintiff's appointment as a financial officer for DCAG in Yangzhou, China, was to be retroactive to January 1, 2001, with a guaranteed period of three years. The contract included plaintiff's repatriation costs to the United States upon completion.

Through a side agreement between DCAG and Freightliner and at plaintiff's request, Freightliner agreed to administer plaintiff's compensation and benefits to ensure continuity from plaintiff's earlier employment in Shanghai. Freightliner, in turn, charged DCAG and was fully reimbursed for plaintiff's pay and benefits package.

In November 2001, DCAG terminated plaintiff effective March 31, 2002. Plaintiff received notice of termination in Yangzhou, China on November 27, 2001. DCAG representatives informed plaintiff that his termination was not "for cause" but was a result of a downturn in the economy.

Plaintiff alleges that he was the only Freightliner expatriate employee who did not receive the benefit of an equivalent position upon completion of an assignment. Plaintiff alleges two claims against DCAG arising out of an alleged breach of contract,[1] and seeks to recover no less than $1,000,000 in unspecified damages under each of his two claims.

---

[1]    Plaintiff alleges that "DCAG willfully breached its contract with plaintiff by unilaterally terminating him without cause contrary to the contractual terms" and "DCAG breached [the] covenant of good faith and fair dealing when it acted dishonestly in entering into a contract with plaintiff that it had no intention of honoring." Complaint, ¶¶ 17, 21.

3 - OPINION AND ORDER

STANDARDS

Plaintiff asserts that this court has both general and specific personal jurisdiction over DCAG.

The plaintiff bears the burden of establishing that the forum has personal jurisdiction over a defendant.  Farmers Ins. Ex. v. Portage La Prairie Mut. Ins. Co., 907 F.2d 911, 912 (9th Cir. 1990).  The burden is greater in cases involving an alien defendant:  "litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty concerns exist."  Sinatra v. National Enquirer, Inc., 854 F.2d 1191, 1199 (9th Cir. 1988)(discussing reasonableness factor); see also Asahi Metal Ind. Co. v. Super. Ct. of Cal., Solano Cty., 480 U.S. 102, 115 (1987)("'[g]reat care and reserve should be exercised when extending [U.S.] notions of personal jurisdiction into the international field.'" (citation omitted)).

Where the court decides the jurisdictional issue based on affidavits and written discovery materials, the plaintiff "is only required to make a prima facie showing of jurisdictional facts in order to defeat a motion to dismiss."  Farmers Ins. Ex., 907 F.2d at 912 (citation omitted).  To establish personal jurisdiction, the plaintiff must show both that the forum state's long-arm statute confers personal jurisdiction over the nonresident defendant and that the exercise of jurisdiction comports with federal due process.  See, e.g., Gray & Co. v. Firstenberg Machinery Co., Inc., 913 F.2d 758, 760 (9th Cir. 1990); Hirsch v. Blue Cross, Blue Shield of Kansas City, 800 F.2d 1474, 1477 (9th Cir. 1986).  The Oregon long-arm statute confers jurisdiction "to the extent permitted by due process."  Gray & Co., 913 F.2d at 760; see ORCP 4 L.

4 - OPINION AND ORDER

Due process requires that a defendant have a "minimum level of contacts with the forum before personal jurisdiction may be exercised." Farmers Ins. Ex., 907 F.2d at 913 (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). If a nonresident defendant's activities in the forum state are substantial or continuous and systematic, the court may assert general jurisdiction over a claim, even if the claim is unrelated to the defendant's forum activities. Hirsch, 800 F.2d at 1477. If the defendant's contacts are neither substantial nor continuous and systematic, the court must determine if "specific" or "limited" jurisdiction exists. Farmers Ins. Ex., 907 F.2d at 913; Hirsch, 800 F.2d at 1477.

To determine whether specific jurisdiction exists in Oregon, the court applies the following three-part test:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which [it] purposefully avails [it]self of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.

> (2) the claim must be one which arises out of or results from the defendant's forum-related activities.

> (3) exercise of jurisdiction must be reasonable.

Hirsch, 800 F.2d at 1477; see also Farmers Ins. Ex., 907 F.2d at 913; see generally Schwarzer, Tashima & Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2006), ¶¶ 3:116-118.

The focus in due process analysis is on the defendant's relationship to the forum and to the litigation. Hirsch, 800 F.2d at 1478. "Purposeful availment" analysis thus turns on whether the defendant's contacts are attributable to the defendant's own actions and not to the unilateral actions of some other party. Hirsch, 800 F.2d at 1478 (citing Burger King Corporation v.

Rudzewicz, 471 U.S. 462 (1985)).  In Hirsch, the court explained that the purposeful availment

prong is satisfied "when a defendant takes deliberate actions within the forum state or creates

continuing obligations to forum residents."  800 F.2d at 1478.  It is not necessary that the

defendant be physically present within or have physical contact with the forum, provided the

defendant's efforts are "purposefully directed" toward forum residents.  Hirsch, 800 F.2d at 1478

(citations omitted).

      With respect to the presence of a local subsidiary's effect on personal jurisdiction over a

parent corporation, it is well established that "[t]he existence of a parent-subsidiary relationship

is insufficient to establish personal jurisdiction" over a nonresident defendant.  Transure, Inc. v.

Marsh & McLennan, Inc., 766 F.2d 1297, 1299 (9th Cir. 1985).  This is true even if the parent

exercises significant control over the subsidiary, provided the corporate separation is real.

Transure, 766 F.2d at 1299 (quoting Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333,

337 (1925)(internal quotations omitted)).

FACTS RELEVANT TO PERSONAL JURISDICTION

      The following facts are undisputed unless otherwise noted.

A.    Defendant's Facts

1.    DCAG's domicile and effective place of business is in Stuttgart, Germany.  "Effective

place of business" is the German corporate law equivalent of the American "principal place of

business."  DCAG is governed by the laws of the Federal Republic of Germany.  Affidavit of Dr.

Siegfried Schwung[2] ("Schwung Aff."), ¶ 2.

_____

    [2]    Schwung is DCAG's Vice President and General Counsel, Truck Group.

2.      DCAG never has had an office in Oregon.  No one ever has been or is authorized to accept service of process on behalf of DCAG in Oregon[3]; DCAG is not now and never has been qualified, licensed, registered or authorized to do business in Oregon; and DCAG does not now and never has had any officers, employees, or agents stationed to work for it in Oregon. Schwung Aff., ¶ 3.

3.      DCAG has never conducted business in Oregon.  DCAG does not conduct advertising or solicitation activities in Oregon, or conduct any sales, service, or other business activities in Oregon, including entering into any contracts to insure persons, property, or risks.  Schwung Aff., ¶ 4.

4.      DCAG does not have and never has had Oregon bank accounts, has never paid Oregon taxes, and has never owned, used, leased, or possessed Oregon real estate.  Schwung Aff., ¶ 5.

5.      Freightliner is a subsidiary of DaimlerChrysler North America Holding Company ("DCAGNA").  DCAGNA, in turn, is a subsidiary of DCAG.  Freightliner and DCAG are independent companies and each strictly observes all corporate formalities necessary for separate legal existence.  Schwung Aff., ¶ 6.

6.      DCAG manufactures and distributes Mercedes-Benz vehicles and parts in Germany. Under its business model, activities of the DCAG group of companies outside Germany are mostly conducted by affiliated companies.  This model is applied strictly to business in the U.S. Supplemental Affidavit of Dr. Siegfried Schwung ("Supp. Schwung Aff."), ¶ 2.

---

[3]      Service was accomplished in Germany, where DCAG is amenable to service, through a special process server this court appointed in April 2006.

7 - OPINION AND ORDER

7.      All products sold in the U.S. under the brands owned by DCAG or any of its group of companies are sold through subsidiaries, each of which follows appropriate corporate formalities necessary for its own, separate, legal existence.  Supp. Schwung Aff., ¶ 4.

B.      Plaintiff's Facts[4]

1.      Plaintiff has been a citizen of the U.S. since 1993.  He has lived in Oregon and paid Oregon state taxes since 1989.  He owns residential property here.  Affidavit of Juntao Cai ("Cai Aff."), ¶ 2.

2.      Plaintiff was hired by Freightliner in 1995, and was sent to China on an expatriate assignment as Chief Financial Officer of the Shanghai Freightliner Joint Venture in 1996.  Cai Aff., ¶ 3.

3.      In 2000, at the end of his assignment, Freightliner informed plaintiff that it had no "equivalent position" for him in Portland.  According to plaintiff, DCAG inquired about keeping him as a Freightliner employee while working for DCAG in Yangzhou, China.  Freightliner requested instead that plaintiff be formally transferred to DCAG.  Cai Aff., ¶ 4.

4.      Plaintiff negotiated with DCAG for a new expatriate contract.  Some of his negotiations took place while plaintiff was on a home visit in Portland.  The documentary evidence shows that negotiations continued over an extended period of time.

5.      According to plaintiff, he was assured by Freightliner executive Scott Evitt that he would work for DCAG "on loan" from Freightliner.  DCAG executive Eike Lippold told Freightliner

---

[4]      Some of plaintiff's "facts" involve suppositions about activities and conversations about which he evidently has no first hand knowledge.  With respect to these "facts," he explains that he "is aware of this information based on my review of * * * correspondence."  E.g., Cai Aff., ¶¶ 4, 6, 9, 11.

that he wanted plaintiff to begin working for DCAG in Yangzhou on February 19, 2001, but stated that plaintiff could return to Shanghai and work for Freightliner "as needed."[5]  Cai Aff., ¶ 5.

6.       In August 2001, after another visit home to Portland paid by Freightliner, plaintiff returned to China, executed the contract with DCAG, and began work as a financial officer in Yangzhou for DCAG.  Cai Aff., ¶ 7.  According to plaintiff, around this time DCAG German executive Thomas Grabe told plaintiff that Freightliner would continue to pay his insurance and pension even though he was working for DCAG.  On inquiry, plaintiff was told by Freightliner executive Evitt that regardless of Freightliner's continued payment of his insurance and benefits, he would not be a Freightliner employee.  Cai Aff., ¶ 8.

7.       On November 14, 2001, plaintiff and DCAG entered into a "Side Agreement" changing the period of his employment to October 1, 2001, through December 31, 2003.  Cai Aff., ¶ 10.

8.       Plaintiff received notice of termination on December 19, 2001.  On March 27, 2002, plaintiff learned that he was to be removed from Freightliner's payroll and benefit plan effective March 31, 2002, but would continue receiving housing expenses in Shanghai through June 2002.  Freightliner then repatriated plaintiff and his family back to Portland.  Cai Aff., ¶¶ 12-13.

Plaintiff also offers some information he obtained from the Internet.  Although these documents are unauthenticated, some courts will consider such documents in motions brought in early stages of litigation. See Bauman v. DaimlerChrysler AG, 2005 WL 3157472 (N.D. Cal. 2005)(motion to dismiss for lack of personal jurisdiction); see also Moose Creek, Inc. v.

---

[5]       Freightliner was in the process of winding down a joint venture in Shanghai, a process that evidently required plaintiff's participation.

9 - OPINION AND ORDER

Abercrombie & Fitch Co., 331 F.Supp.2d 1214, 1225 n.4 (C.D. Cal. 2004)(motion for

preliminary injunction).

Plaintiff's Internet submissions, attached to the Affidavit of Jonathon Ostar, include

general information about Freightliner. The documents add little to my analysis because they do

not help establish DCAG's presence in Oregon for personal jurisdiction purposes.

DISCUSSION

A.    General Jurisdiction

Plaintiff contends that this court has general jurisdiction over DCAG because, according

to him, DCAG engages in continuous and systematic activities within Oregon. In the alternative,

plaintiff asserts, for the first time in his supplemental response, that Freightliner either acts as

DCAG's agent in Oregon or is DCAG's alter ego, thus permitting this court to assume personal

jurisdiction over DCAG. For the reasons explained below, plaintiff has not made a prima facie

showing sufficient to establish general jurisdiction over this alien defendant in Oregon.

1.    Continuous and systematic activities

To support his "continuous and systematic activities" argument, plaintiff contends, based

on general information he pulled from various websites, that: (1) DCAG earns approximately

$80 billion from sales of vehicles in the U.S.; (2) "DaimlerChrysler" employs more than 100,000

people in the U.S., including 4,100 Oregonians, with an annual payroll of $225 million; (3)

DCAG stock is traded on the New York Stock Exchange, among others; (4) DCAG executives

communicated with Governor Kulongoski, resulting in an addition of 700 jobs in Portland by

Freightliner[6]; (5) DCAG has built Freightliner to a position of dominating the market for Class 5 and higher commercial vehicles since acquiring Freightliner in 1981[7]; (6) DCAG executives visited Freightliner to celebrate the 25th anniversary of DCAG's acquisition of Freightliner in June 2006; (7) "DaimlerChrysler"[8] executives met with Oregon legislator Karen Minnis in 2006; and (8) DCAG allegedly has a headquarters in Michigan. See Ostar Aff. and attached Exhibits.

Even if plaintiff's characterization of the evidence is accurate,[9] it does not establish that DCAG engages in continuous and systematic activities in *Oregon*. The bottom line is that DCAG's presence in Oregon is limited to having a subsidiary here, which is "insufficient to establish personal jurisdiction" over a nonresident defendant. Transure, Inc., supra, 766 F.2d at 1299.

    2.   Alter ego/ Agency

Plaintiff also argues an agency theory to establish general jurisdiction over DCAG in Oregon. As a general proposition, a nonresident parent's interaction with a subsidiary does not result in the subsidiary's forum having general jurisdiction over the parent unless those interactions are sufficient to meet the alter ego or general agency tests for jurisdiction; otherwise,

---

[6]    The meeting took place in Germany, not Oregon. See Ostar Aff., Exh. 4, p. 2 ("After I talked with Daimler-Chrysler in Stuttgart, Freightliner - its truck division - added 700 high paying industrial jobs.")

[7]    Actually, Daimler-Benz acquired Freightliner, then in 1998 merged with Chrysler Corporation to form DaimlerChrysler. Ostar Aff., Exh. 2.

[8]    Plaintiff's exhibits generally refer to "DaimlerChrysler," not DaimlerChrysler AG, so the accuracy of plaintiff's assertions concerning DCAG's alleged presence in the U.S. generally and Oregon specifically is suspect. For example, the "DaimlerChrysler" headquartered in Michigan is DaimlerChrysler Corp., not DaimlerChrysler AG. Defendant's Sur-Reply Memorandum, p. 6 n.6.

[9]    See footnote 8.

a nonresident parent would be subject to jurisdiction in every state where it has a subsidiary, which is not now and never has been the case.   See, e.g., Doe v. Unocal Corp., 248 F.3d 915, 928 (9th Cir. 2001)(that nonresident defendant was "an active parent corporation involved directly in decision-making" of subsidiary in the forum did not result in subsidiary's forum having general jurisdiction over parent because plaintiff's evidence did not satisfy either alter ego or general agency test for jurisdiction).

To establish alter ego, plaintiff must show that "the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." Doe, 248 F.3d at 926 (internal quotations and citations omitted).  This test may be satisfied by evidence showing that the parent dictates every facet of the subsidiary's business, from broad policy decisions to routine matters of day-to-day operation.  Id.   Plaintiff presents no evidence to support this theory.

To establish general agency, plaintiff must show that the alleged general agent, here, Freightliner, performs services sufficiently important to the nonresident defendant that if it did not have the general agent to perform them, the nonresident defendant would undertake to perform substantially similar services.  Unocal, 248 F.3d at 928.  "At an irreducible minimum," the agent must perform some service or engage in some meaningful activity in the forum state on behalf of the principal such that its presence substitutes for the presence of the principal."  248 F.3d at 930.  In evaluating this factor, the court looks at the main business[es] of the nonresident defendant and of the alleged general agent; if the business of the parent is carried out entirely at the parent level, the subsidiary's activities are not imputable to the parent.  248 F.3d at 929.

Plaintiff's theory of agency rests entirely on communications between plaintiff, Freightliner, and DCAG during negotiations over certain aspects of his employment.  According

12 - OPINION AND ORDER

to plaintiff, the communications demonstrate that Freightliner acted as DCAG's agent with respect to his employment with DCAG, thereby subjecting DCAG to general jurisdiction in Oregon by virtue of Freightliner's presence here.  As explained in detail below, plaintiff's characterization of the relationship between Freightliner and DCAG for purposes of specific jurisdiction is not supported by the evidence.  In any event, the evidence does not establish DCAG as Freightliner's alter ego, nor does it establish a general agency relationship between the parent and the subsidiary for purposes of general jurisdiction.  DCAG does not manufacture or sell trucks, and there is no evidence suggesting that if DCAG shed Freightliner, it would then commence the business of manufacturing and selling trucks in Oregon.  See Unocal, 248 F.3d at 928.

B.    Specific Jurisdiction

Plaintiff contends that DCAG is subject to specific jurisdiction in Oregon based on Freightliner's role in plaintiff's negotiations with DCAG over the terms of his employment contract.

To establish specific jurisdiction in Oregon, plaintiff must show that (1) DCAG did some act or consummated some transaction in Oregon by which it "purposefully avail[ed] [it]self of the privilege of conducting activities in [Oregon], thereby invoking the benefits and protections of its laws"; (2) plaintiff's claim must arise out of or result from DCAG's forum-related activities; and (3) exercise of jurisdiction must be reasonable.  See, e.g., Hirsch, supra, 800 F.2d at 1477.

With respect to the first two factors, plaintiff contends that "DCAG entered into contract negotiations with plaintiff, purposefully directing its activities towards Freightliner in Portland for assistance."  Plaintiff's Supplemental Response, p. 18.  Plaintiff further asserts that

13 - OPINION AND ORDER

DCAG affirmatively and intentionally directed activity into Oregon for the purpose of furthering plaintiff's contract negotiations and eventual reassignment and enlisting Freightliner's services as plaintiff's proxy employer. * * *  DCAG also intentionally directed activity towards plaintiff while he was on a home leave in Portland, continuing contract negotiations with plaintiff and threatening him with contract ultimatums after meeting directly with Freightliner CEO Hebe[10] regarding plaintiff's status.

* * *

Perhaps most significant are DCAG's intentional acts in the forum to protect itself from foreseeable legal consequences of its actions.  DCAG worked in close connection with Freightliner while negotiating the contract, first attempting to keep plaintiff as an employee of Freightliner "on loan" to DCAG, then voluntarily agreeing that Freightliner would continue[] as plaintiff's "technical" employer.  Grabe [DCAG] sent the proposed written contract and negotiation response to Evitt [Freightliner] in Portland for Freightliner's review and comment. * * * Grabe then sent advance notice to Evitt of DCAG's proposed termination of plaintiff, requesting comment on any anticipated problems. * * * Grabe then informed Evitt that DCAG had in fact decided to terminate plaintiff's employment, again asking Evitt whether this action posed any "formal or legal problems."

Plaintiff's Supplemental Response, pp. 18-20.  The evidence, which consists of letters and e-mail messages, does not support plaintiff's characterization of DCAG's activities.  Instead, the evidence shows that plaintiff himself sought to be retained by Freightliner, or at least to keep certain benefits provided by Freightliner, and that Freightliner agreed to help him as an accommodation to him, not to DCAG.  As shown by the documents, the history of the negotiations is as follows.

Under his expatriate contract with Freightliner, plaintiff was well-paid, had numerous benefits related to his placement in Shanghai, and was entitled, at the end of his three-year assignment, to be presented "with an opportunity to either extend your assignment for an

---

[10]        The meeting took place in Germany.  Supp. Ostar Aff., Exh. 7, p. 2.

additional period of time or return to a Freightliner position within the United States at a level

and pay at least equivalent to the position you had immediately prior to the China Expatriate

Assignment."  Supp. Ostar Aff., Exh. 1, p. 4.  At the end of his assignment, however, Freightliner

did not have a position available.  In September 2000, Freightliner's Scott Evitt and DCAG's

Barnd Weidner were in discussions concerning new job opportunities for plaintiff in China.

Weidner asked Evitt to "doublecheck the conditions of his current contract," and noted that

"[plaintiff] is proposing to stay an employee of Freightliner working for DCNEA [DC Northeast

Asia] * * * to maintain his status at FL and as his family likes to repatriate to Portland in the

future.  He [plaintiff] is also asking [to keep] his salary and benefits package as provided to him

in the past by Freightliner.  If Freightliner would agree to this you then would charge the

respective cost * * * to DCAG."  Supp. Ostar Aff., Exh. 2 (bracketed material and emphasis

added).  Evitt responded by letter dated September 22, 2000.  In his letter,  Evitt explained that

> The bottom line is that no position outside of the Shanghai joint venture exists
> within Freightliner for [plaintiff]. * * * Under the circumstances, it would not be
> practical to retain [plaintiff] as a Freightliner employee assigned to DCNEA
> through an administrative charge-back relationship.  I recommend he be formally
> transferred to DaimlerChrysler with all employment conditions and benefits
> covered under an expatriate contract for his new position in DCNEA.

Supp. Ostar Aff., Exh. 3.

In early November 2000, plaintiff e-mailed Evitt about a verbal offer he had received

from DCNEA in China.  Plaintiff described the offer and his problems with it, noting that before

accepting any offer, he needed to "understand the ramifications of being paid by the German side

of the company," and stating that the offer did not look "tremendously promising."  Supp. Ostar

Aff., Exh. 4.

15 - OPINION AND ORDER

Through a series of communications, plaintiff, Freightliner, and DCAG attempted to work out the issues plaintiff raised, including his ongoing issues with Freightliner and issues concerning his new contract with DCAG, such as his proposed pay, medical coverage, tax consequences, housing, transportation, retirement benefits, etc.   Some of the communications took place while plaintiff was in Portland on leave, but most of the negotiations took place while he was working in China.   See, e.g., Supp. Ostar Aff., Exhs. 4, 5, 6, 7, 9, 10.  On March 15, 2001, Evitt summarized plaintiff's status in an internal Freightliner e-mail as follows:

> [Plaintiff] is continuing to assist Freightliner, on an as need basis, with the final closure of our operations in China.  Concurrently, he is in the process of transferring to DCNEA.  Although he may have already technically reported to work in his new job, all of the administrative arrangements have yet to be finalized.  Therefore, the agreement I have with him is that Freightliner will continue to provide pay, benefits and expatriate support until such time as his transition is complete.  If there is any "overlap," either he or DCNEA will reimburse Freightliner for the difference.  The bottom line is that I am reluctant to cut him off until I have some assurance that he and his family are fully covered under DCNEA's programs.  As soon as that confirmation is available, I will initiate the required documentation to terminate his employment with Freightliner.

Supp. Ostar Aff., Exh. 11 (emphasis added).

It is apparent from plaintiff's e-mail communications with Freightliner and DCAG personnel that he was not happy with several aspects of his proposed new contract.  On March 20, 2001, he complained to Evitt that he had been in communication with the human resources manager in Stuttgart, but had received no answers to his questions.  Among the issues he raised at that time were family transportation (he requested a minivan and driver), taxes (he wanted to work with the same tax expert), banking and health insurance.  See Supp. Ostar Aff., Exh. 12.

16 - OPINION AND ORDER

By May 2001, plaintiff was working for the DC joint venture in Yangzhou.  At that time,

DCAG sought a formal letter from Freightliner certifying termination of plaintiff's assignment so

that his tax situation could be straightened out.  According to an e-mail dated May 15, 2001,

"IIT" tax payments were being held up because plaintiff's relationship with Freightliner had not

been formally concluded.  Supp. Ostar Aff., Exh. 13.  That e-mail describes plaintiff as being

"still 'technically' employed by Freightliner."[11]  It is apparent from the various communications

that Freightliner was retaining plaintiff as "technically" employed as an accommodation for him

due to the delay in finalizing his new contract.  Thus, Evitt wrote to a DCAG representative on

May 31, 2001, that

> As I previously explained to Mr. Grabe, Freightliner is continuing to provide full
> pay and benefits to [plaintiff], including healthcare and pension benefits, until all
> of the terms of his employment with DCNEA are finalized.  The Agreement with
> [plaintiff] and DCNEA is that all expenses incurred by Freightliner since April 1,
> 2001 will ultimately be reimbursed.

Supp. Ostar Aff., Exh. 17.

On June 19, 2001, plaintiff wrote Evitt to apprise him of his ongoing situation.  In that

e-mail, plaintiff complains that he still has been unable to finalize his contract with DCAG, and

states "I really appreciate what you have been doing for me and hope you can continue to

support me in the near future until I get everything completed on the other end."  Supp. Ostar

Aff., Exh. 19.  Evitt responded as follows:

---

[11]     On April 27, 2001, Evitt wrote an e-mail to Freightliner's tax director concerning
plaintiff's personal income tax in China.  Evitt notes that "I expect that we will be able to bring
our employment relationship with [plaintiff] to a formal conclusion in the very near future.  I am
convinced that he is doing everything reasonably possible to transition into DCNEA.  In the
meantime, Freightliner will continue technically to employ him.  I must defer to Wayne Brock
regarding whether [plaintiff] is still performing any 'work' for Freightliner in Shanghai."  Supp.
Ostar Aff., exh. 13, p. 2.

17 - OPINION AND ORDER

> Thanks for keeping me apprised.  Your transition to DCNEA is taking an
> unbelievably long time.  Nevertheless, <u>Freightliner stands behind its commitment
> to assist you while the terms of your employment contract are under review</u>.
> Please continue to do everything possible on your end to complete the process.

Supp. Ostar Aff., Exh. 19 (emphasis added).

In late July 2001, Grabe of DCAG sent Evitt a copy of a proposed letter to plaintiff concerning his employment contract, and asked for any comments or recommendations.  The contract itself had been executed by DCAG executives in November 2000.  Supp. Ostar Aff., Exh. 20.  On August 3, 2001, Grabe sent plaintiff the letter, which provided "answers to your 10 questions" and informed him that the contract executed in November 2000 was "still valid and [the] base of our discussion."  Supp. Ostar Aff., Exh. 21.  The letter explains that by signing the contract and a side letter dealing with the ten issues, as well as a "separation assignment package from [F]reightliner," he would have a "time limited contract in [C]hina without liability to take back neither to [F]reightliner nor to DaimlerChrysler (due to the separation assignment)."  <u>Id.</u>

> On August 7, 2001, plaintiff wrote Evitt again, explaining that
>
> Mr. Grabe * * * told me that Freightliner agrees to continue to cover my family's
> and my international health insurance and Worldwide Emergency Medical
> Assistance even now I am working for Yaxing Benz Limited.  So we are still able
> to enroll [in] our medical plan every year as we did before through Freightliner.
>
> Also Freightliner agrees to continue pension funds in this regard.  I need to know
> if it's correct that my years of service at Yaxing Benz Limited will be counted and
> calculated towards my Freightliner pension.  Of course Stuttgart will reimburse
> Freightliner for this matter.  Is it also true for my 401k plan?

Supp. Ostar Aff., Exh. 22.  On August 14, 2001, plaintiff e-mailed Evitt about continuing his insurance coverage and pension benefits through Freightliner.  <u>See</u> Supp. Ostar Aff., Exh. 23. The text of that e-mail is not included in the Exhibits, but on August 27, 2001, Evitt responded as follows:

18 - OPINION AND ORDER

In order to keep you on our benefit plans, you will need to technically continue employment with Freightliner. This is acceptable, provided we can bill back DCNEA for all expenses paid on your behalf. That means continuing you on our payroll and benefit plans. Alternatively, you will need to transfer out of Freightliner's benefit plans and sever your employment relationship with Freightliner entirely.

Please discuss this matter with your DC Personnel contacts and advise me of your collective decision. I would like to bring this matter to a conclusion ASAP.

As soon as I receive your response, I will write a letter to the DC HR Department to document the agreed upon understanding.

Supp. Ostar Aff., Exh. 23. On September 3, 2001, plaintiff forwarded Evitt's e-mail to Grabe with the following comments:

In order for Freightliner to cover my health insurance and pension benefits, the payroll will also have to go through Freightliner in the United States. [Evitt] is willing to do that, as long as you let him know the terms of my contract. Of course, Freightliner will pay accordingly, expecting full reimbursement from DaimlerChrysler for salary and all benefits.

If you agree, it will save a lot of trouble all around as all systems are in place right now, including my accounts, etc. I think this is the way Mr. Kanzen was hoping it could be arranged in the beginning. If we both agree to this method, Scott Evitt will go ahead and do it right away.

As my contract with DC was signed in August and my work permit began in Yangzhou, China on August 15, I would like this arrangement to begin as of September 1, 2001, instead of April 1, 2001. There are potential tax benefits to the company.

Supp. Ostar Aff., Exh. 24 (emphasis added).

On November 14, 2001, plaintiff executed a "side agreement" specifying that his contract of employment would commence on October 1, 2001, and end on December 31, 2003. Supp. Ostar Aff., Exh. 27. Meanwhile, on September 28, 2001, Grabe informed Evitt that the president of Yaxing Benz Limited wanted to terminate plaintiff at the end of the year for insufficient performance, and inquired whether it would cause "any problems concerning the termination of

19 - OPINION AND ORDER

the ongoing employment of [F]reightliner?"  Evitt responded, "[n]ot a problem for Freightliner.

The terms of our agreement with him have already been agreed upon and documented."  Supp.

Ostar Aff., Exh. 32.  In a November 22, 2001, e-mail to Evitt, Grabe confirmed that "we have

decided to dismiss [plaintiff] as of [M]arch 31st, 2002," and requested "advice if you see some

formal or legal problems."  Evitt responded that "I recommend that you proceed with your plans,

as you deem appropriate.  I will be prepared to handle any outstanding commitments on

Freightliner's part."  Supp. Ostar Aff., Exh. 33.  Finally, on November 27, 2001, DCAG gave

plaintiff written notice that his employment would be terminated effective March 31, 2002.

Supp. Ostar Aff., Exh. 29.

        The above detailed factual background, taken from plaintiff's own documents, belies

plaintiff's contention that DCAG intentionally conducted business activities in Oregon.

Plaintiff's Response, p. 17.  Plaintiff argues that "DCAG routinely consulted Freightliner

executives on matters essential to plaintiff's employment, negotiated terms of his employment

with Freightliner executives, and, on its own volition and for its own benefit, enlisted

Freightliner to assume essential duties of plaintiff's employer."  Id.  As demonstrated by the

communications between the various players, however, plaintiff enlisted Freightliner's assistance

because he wanted his benefits, including his salary, housing, transportation, etc., to be the same

or essentially similar to those he enjoyed as a Freightliner employee.  Freightliner

accommodated plaintiff and worked to help him achieve a new employment contract with

DCAG that satisfied plaintiff's needs, probably at least in part because Freightliner itself was

unable to fulfill its own employment contract with plaintiff.  The bottom line is that DCAG, an

alien corporation with no presence in Oregon, hired plaintiff while he was working under an

expatriate contract in China.  Oregon happened to be plaintiff's chosen "home base," but he did not live or work in Oregon during his negotiations with DCAG.  Almost all communications took place by e-mail; plaintiff easily could have been anywhere in the world during negotiations, and indeed, most of the time he was in China.  That plaintiff's employer at the time, Freightliner, was located in Oregon and that some negotiations took place while plaintiff was on leave in Oregon constitutes more coincidence than evidence that DCAG "purposefully avail[ed] itself of the privilege of conducting activities in [Oregon], thereby invoking the benefits and protections of its laws * * *."  Hirsch, supra, 800 F.2d at 1477.

Nor does plaintiff's claim arise out of DCAG's "forum-related activities."  Plaintiff's claim arises out of DCAG's alleged breach of the contract, not out of the negotiations leading to the contract.  See Complaint, ¶¶ 17, 21.[12]  The contract itself was to be performed in Germany and China, not Oregon.  Plaintiff's termination took place in Germany and China, not Oregon.  Thus, no aspect of plaintiff's claim arises out of DCAG's alleged activities in Oregon.

The final factor is reasonableness.  From a purely financial perspective, it might be reasonable for DCAG to litigate plaintiff's claims in Oregon.  In all other respects it is not reasonable to require a German company to litigate the breach of a China-based contract in Oregon because there is no jurisdictional basis to do so.

As stated at the outset of this opinion, plaintiff's burden of establishing personal jurisdiction is greater in cases involving an alien defendant because important sovereignty concerns exist; indeed, "'[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'"  Asahi Metal Ind. Co., supra, 480 U.S. at

_____

[12]        See also footnote 1.

21 - OPINION AND ORDER

115 (citation omitted).  Plaintiff has not met his burden.  Consequently, I grant DCAG's motion

to dismiss for lack of personal jurisdiction, and moot DCAG's alternative motion.

## CONCLUSION

Defendant's motion to dismiss (# 11) for lack of personal jurisdiction is granted, and

defendant's alternative motion is moot.  Any other pending motions are denied as moot and this

action is dismissed without prejudice.

DATED this 22nd day of March, 2007.


 /s/ Robert E. Jones
ROBERT E. JONES
U.S. District Judge